UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ROLAND JOHNSON,

                              Plaintiff,                    No. 04-CV-6634 CJS

        -vs-
                                                            DECISION AND ORDER

JOHN E. POTTER, Postmaster
General, United States Postal
Service,

                              Defendant.

_____

APPEARANCES

For plaintiff:          Christina A. Agola, Esq.
                        730 First Federal Plaza
                        28 East Main Street
                        Rochester, New York 14614


For defendants:         Michael A. Battle
                        United States Attorney for the Western
                        District of New York
                        Lynn S. Edelman, Esq., of Counsel
                        138 Delaware Avenue
                        Buffalo, New York 14202


INTRODUCTION

        This is an employment discrimination action alleging retaliation and constructive

discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended,

42 U.S.C. § 2000e *et seq*.  Now before the Court is defendant's motion [#3] to dismiss

the amended complaint for failure to state a claim pursuant to Federal Rule of Civil

Procedure ("Fed. R. Civ. P.") 12(b)(6), and alternatively, for summary judgment pursuant

to Fed. R. Civ. P. 56, and plaintiff's cross-motion [#9] for leave to conduct discovery

1

pursuant to Fed. R. Civ. P. 56(f).  For the reasons that follow, defendant's application for summary judgment is granted, plaintiff's application is denied, and this action is dismissed.

BACKGROUND

This is the third employment discrimination lawsuit which the plaintiff has filed against the United States Postal Service. *See, Johnson v. Henderson*, 90-CV-7138 CJS and  *Johnson v. Potter*, 04-CV-6239 CJS.  Because they are relevant to the instant case, the Court will set forth the facts of the two previous lawsuits.  Plaintiff is an African American male who was hired by the United States Postal Service in Buffalo, New York in 1985.  In September 1989, plaintiff filed a complaint with the Postal Service's Equal Employment Opportunities Office, alleging that he had been denied a promotion to the position of "204B Supervisor" because of his race.  At that time plaintiff's supervisor was Bill Mitchell ("Mitchell").  According to plaintiff, Mitchell promised plaintiff that he would be given another opportunity for promotion to 204B Supervisor, but later reneged on the promise.  Plaintiff subsequently commenced a lawsuit in this Court pursuant to Title VII entitled *Roland C. Johnson, Jr. v. William J. Henderson, Postmaster General, United States Postal Service*, Case No. 90-CV-7138 CJS(F) ("case 90-CV-7138").

Plaintiff continued working at the Postal Service while his lawsuit proceeded.  In or about September 1998, plaintiff was promoted to the position of Claims and Inquiry Clerk, PS-5.  At all relevant times thereafter, at the branch where plaintiff worked, there were two other Claims and Inquiry Clerks, Judith Grove ("Grove") and Diana Chandler ("Chandler").  Grove and Chandler held the same job classification as plaintiff, PS-5, but

had more seniority than plaintiff.  Plaintiff's position was also referred to as "Lost and

Found" and "Loose-In-The-Mails" clerk.  In that capacity, plaintiff was responsible for

handling items inadvertently mailed, dropped into mailboxes, or lost at the post office,

such as bank envelopes containing cash and checks, as well as personal property such

as purses, wallets, keys, gift certificates, and photographs.  Plaintiff stored these items in

a locked cabinet in his work area. Plaintiff was the only one of the three Claims & Inquiry

Clerks who routinely handled lost and found money.  Plaintiff also worked with a Kathy

Deneka ("Deneka"), whose title was Complaints and Inquiry Clerk, PS-6.  Plaintiff's

supervisor was Maryann Molenda ("Molenda").

Plaintiff's lawsuit in case 90-CV-7138 was tried before the undersigned in

November 1998.  On the third day of the trial, the parties agreed to a complete

settlement.  In exchange for settling the lawsuit, defendant agreed to pay plaintiff

$90,000.00 and restore 496 hours of sick leave.  Plaintiff contends that after the lawsuit

was settled, his immediate supervisor,  Molenda, began to harass him and retaliate

against him.

The alleged post-lawsuit harassment began with a disagreement between plaintiff

and Molenda over the procedures plaintiff was to use for inventorying and storing certain

items of mail.  According to plaintiff,

> supervisor Molenda directed me to keep a special 'log' of every single time
> I went into my overhead cabinet where money and registered mail was
> kept, in addition to the normal log that identified 'Matters Without Address
> Found in the Mails' that I was required to keep.  No other postal employee
> under Molenda's supervision was subject to this treatment; indeed, my
> predecessor Lester Morris was only required to maintain the 'Matters
> Without Address Found in Mails' log.

Johnson Aff., 04-CV-6239 [#45] ¶ ¶ 37-38.  While plaintiff refers to "no other postal

employee being subject to such treatment," as indicated above, he was the only

employee who routinely handled lost and found money.  Plaintiff's specific objection was

that his predecessor had not been required to keep such a log.  Molenda described the

event differently, stating that plaintiff

> was off from work for approximately 3 days during the early portion of
> November 1998.  When he returned he stated his top drawer was opened
> and that he remembers locking it when he left.  He mentioned that there
> are only two sets of keys; one he has and one I have.  He requested I sign
> off that he is not responsible for missing items.  I denied his request and he
> filed a grievance where an agreement was reached.

*Id*. , Ex. W.  Molenda made no reference to plaintiff having to keep a special "log."  The

agreement referred to by Molenda, reached between the Postal Service and plaintiff's

union, provided, in relevant part:

> Management agrees to implement the following actions:
>
> 1) Clerk will deposit all monies on a daily basis.
>
> 2) Management will establish a inventory log, for all loose in the mail items
> kept under lock and key.  Clerk will annotate on the inventory log final
> disposition of all items.
>
> 3) Manager, Consumer Affairs will arrange to have locks changed on
> drawers and cabinets.
>
> 4) Grievant's supervisor will maintain duplicate key.  Whenever duplicate
> key is issued, the Mgr CA will record the individual name, time/date, and
> return time/date.

*Id*., Ex. E.  Notably, while plaintiff claimed that he filed the grievance in response to

Molenda requiring *him* to establish a log, the subsequent agreement required the postal

service to "establish" such a log, and defendant maintains that plaintiff was only required

to keep the log as a result of this agreement.

In May 1999, Karl Anderson ("Anderson"), one of plaintiff's supervisors,

commented that plaintiff's work area was "the dark side of the room."  Plaintiff insists that this was a racial slur, although Anderson maintains that he was making a joke based upon the movie "Star Wars."  In papers submitted in connection with a summary judgment motion, plaintiff suggested that Anderson's comment was racially motivated because plaintiff and another black employee were the only African-Americans on the side of the room to which Anderson was referring.  However, in a deposition, plaintiff testified that there were African Americans stationed on both sides of the room when Anderson made his remark.

On or about May 27, 1999, plaintiff and his union representative met with the Postal Service's District Manager, Nicholas Fabozzi ("Fabozzi"), to discuss the alleged harassment by Molenda and the "dark side" comment by Anderson.  Plaintiff alleges that during the meeting, Fabozzi stated that he "used to participate in the telling of racial jokes" and that it had been "no problem."

On or about December 2, 1999, Molenda left a post-it note on plaintiff's telephone, directing him to forward calls when he was away from his desk.  Plaintiff contends that he was singled out in this regard, and that Molenda did not tell other employees to forward their calls until after he complained of disparate treatment.  Molenda, however, maintains that she left similar notes on all of her employees' phones at different times.

In January 2000, plaintiff claims that he overheard Grove and Deneka having a conversation in which they made comments which, although not about him, he found racially-offensive.  Plaintiff states that "they were speaking about 'blacks not wanting to work and standing on the corner selling drugs and stuff.'" Plaintiff reported the incident to

Molenda, who responded by issuing a memo that stated:

> It has come to my attention that employee(s) are using profane or obscene language in the office. This type of behavior will not be tolerated by management. This language is offensive to others. We must keep in mind that this office is a customer service officer, where at no given time [sic], customers are in our office or on the telephone who may also hear this type of language. This also relates to conversations amongst one another (when others can hear you) that may be offensive to others. Our workplace is a professional place of business and we must conduct ourselves in this manner. Thank you for your cooperation.

Pl. Supp. Appendix, 04-CV-6239 [#80], Ex. L. Although this memo was addressed to all of the employees in the office, and was sent to address plaintiff's complaint, plaintiff insists that the memo singled him out to be reprimanded in retaliation for having complained.

On or about February 16, 2000, Molenda told plaintiff to "drop everything" and handle claims while she and Deneka "had a personal conversation over coffee in her office." On or about March 6, 2000, plaintiff and his union representative again met with Fabozzi to complain about what plaintiff viewed as a continuing pattern of harassment by Molenda, as well as her preferential treatment of Deneka. During the conversation, Fabozzi again referred to his having told racial jokes in the past. Plaintiff asked that Molenda be required to attend "sensitivity training," but Fabozzi dismissed the idea.

On or about August 18, 2000, Molenda called a unit meeting and announced that she was taking duties that had been performed by the Claims and Inquiry department in Rochester, and was adding them to the Buffalo Claims & Inquiry department. Molenda, in her affidavit submitted in connection with the EEO investigation, described the situation as follows:

> I also had 2 Claims & Inquiry clerk positions in Rochester. Due to

6

technology, the workload diminished and those 2 positions were abolished. An 800 line was put in for Rochester customers to call and that line is on all 3 level 5 Claims & Inquiry clerks phones in Buffalo, not just Roland's.  A light blinks when there is a call and the first to pick it up takes the call.  If no one answers, it rolls over to Claims & Inquiry Clerk Bill Maturski's voice mail.  The line is not on the level 6's phone (Kathy Deneka's) since the intent of the line was to assist customers in Rochester with Claims & Inquiry (level 5 positions).

Pl. Appendix to Local Rule 56.1 Counterstatement 04-CV-6239 [#71], Ex. T.  Plaintiff

initially alleged that Molenda used the occasion to retaliate against him by assigning

additional duties only to him.  However, he later admitted that the other PS-5 Claims and

Inquiry Clerks were also given additional duties similar to the ones he was given.

Nonetheless, plaintiff continued to claim that Deneka, was treated preferentially because

she did not receive any additional PS-5 work, even though she was a PS-6 clerk.

Plaintiff also claimed he told Molenda that he was overwhelmed with work and

asked for her help, but she refused.  According to plaintiff, Molenda said that, if anything,

she would consider creating an additional position for someone to assist Deneka in her

work.

On August 25, 2000, plaintiff filed another EEO charge.  In the EEO complaint,

plaintiff described an incident on August 18, 2000, as follows:

I was 'combatively' approached by Consumer Affairs Manager Maryann Molenda.  She remarked, 'I need to review the way you are doing things, especially the way you handle the money.'  This overt racist statement has numerous + frequent [sic] since Sept. 1998.

Pl. Appendix to Local Rule 56.1 Counterstatement of Facts, 04-CV-6239 [#71], Exhibits I

& U.  However, plaintiff subsequently gave a different version of those events:

Immediately *after* Plaintiff filed his August 25, EEO charge, Molenda aggressively approached Plaintiff in front of others and remarked 'I want to review the way you are doing things, *the way you are doing them is*

*probably wrong.*' (Exhibit A, p. 107, Lines 20-23).

Johnson Aff., 04-CV-6239 [#66] ¶ 70.

Plaintiff alleged that Molenda subsequently had him bring trays of mail to her for inspection, and kept lists of his tasks, but did not do so for other employees. Plaintiff also claimed that Molenda continued to scrutinize his handling of money. Plaintiff further maintained that Molenda then made a list of his activities, and gave it to the union as proof that plaintiff "did not have enough work to do." On August 30, 2000, Molenda directed that certain work which plaintiff had been performing be performed by another unit known as the "Nixie Unit." On October 11, 2000, Molenda directed the Nixie Unit not to send trays of mail to plaintiff, purportedly to avoid double handling. Molenda also told plaintiff not to continue his usual practice of retrieving mail from the Nixie Unit for processing, because she would get it herself. According to Molenda,

> everyone's work was monitored, tallied, counted and recorded, not just Roland's. This was done primarily because of the changes that occurred in Claims & Inquiry workload being done electronically in addition to other changes that HQ made nationally that affected Claims & Inquiry workload. With the ["]loose in the mails["] which Roland works on, I wanted to see what Nixie [Unit] rewrap was giving him. [Nixie Unit has] been know to use us as a dumping ground. I have done this practice with the previous claims and inquiry clerk who now is retired. As a manager, the above monitoring should occur to know the workload and to correct any deficiencies found.

Pl. Appendix to Local Rule 56.1 Counterstatement 04-CV-6239 [#71] Ex. T. Plaintiff, however, claimed that Molenda was scrutinizing his work in order to harass him, and in order to decrease his workload so that she could justify eliminating his position.

In February 2001, Molenda sent a letter to the president of plaintiff's labor union and to the Postal Service's labor relations specialist, notifying them that she intended to

8

eliminate plaintiff's PS-5 position and create a new PS-6 position.  Molenda's letter

stated:

> This letter is to officially notify you, as outlined in Article 37 of the National
> Agreement, that position 2336157, Claims & Inquiry Clerk, currently held
> by Roland Johnson, is under consideration to be rescinded and to post a
> Complaints & Inquiry Clerk position, level 6.    The workload for Claims &
> Inquiry Clerks [PS-5] will continue to decrease and the workload impacted
> by the following events:
>
>> In Fall of 2000, signature capture (electronic filing) took
>> place.  This sharply reduced the workload for Claims &
>> Inquiry eliminating the manual filing and the manual lookups
>> for accountable mail.
>>
>> Because of the electronic filing of accountable mail, filing
>> claims is conducted in a shorter time frame.
>>
>> Effective September 1999, the Postal Inspection Service
>> changed the procedures in handling PS Form 1510 (mail
>> loss/rifling report) which sharply reduced the workload for
>> Claims & Inquiry.
>>
>> A decrease in claims being processed took effect in 1997
>> because of local adjudication with unnumbered claims.
>> Streamlining efforts on overall claims process is under review
>> by Headquarters.
>>
>> The National Call Centers that are in place and their
>> continued national roll out will impact the number of calls.
>>
>> Headquarters is currently identifying process improvements
>> for handling loose in the mail items at the point of discovery.
>> A finished product should be seen sometime in Spring.
>
> The workload for *Complaints* & Inquiry [PS-6] has steadily increased.
> Customers have additional means in contacting us with their service issues
> th[a]n just by telephone or in writing.  Service issues are also received
> electronically through the National Call Centers and the Internet.  A review
> of the workload by the Claims & Inquiry Clerks and Complaints & Inquiry
> Clerk has been conducted and warrants this decision.  I am asking for your
> input by February 21, 2001.

Molenda Aff., 04-CV-6239 [#79] Ex. A (emphasis added).  There is no indication in the

record that the union responded to this letter.  On or about February 14, 2001, Molenda

told plaintiff that she was going to eliminate his position, and create a new Complaints

and Inquiry Clerk position as a PS-6 position, for the purpose of assisting Deneka.  On

March 7, 2001, Molenda notified the union that she was going to "revert" plaintiff's

position and post a new PS-6 position.  Plaintiff complained that plaintiff was singling

him out for retaliation.  In response to that charge, Molenda told the EEO that

> Roland is taking this personally.  It is not HIS position I want to eliminate.  I
> observed that there was not enough work for 3 level 5 Claims & Inquiry
> clerks, however, there was enough workload for another Complaints &
> Inquiry Clerk position.  This occurred because of workload and volume that
> I conducted [sic] for several months when changes began in Claims &
> Inquiry workload due to HQ changes made nationally.  While it is true, that
> because Roland is the junior employee, it will be the position he occupies,
> but the reason for that is contractual, not personal, based on unit seniority.

Pl. Appendix to Local Rule 56.1 Counterstatement, 04-CV-6239 [#71] Ex. T.  Plaintiff

claimed that Molenda's proposal violated the collective bargaining agreement between

the union and the postal service.  However, the union did not support him in that regard.

Plaintiff subsequently filed complaints with both the union and the Merit System

Protection Board.  On April 30, 2001, the postal service advised plaintiff that it was

"rescinding" its attempt to eliminate the position at that time, but would review the matter

in six months.

On May 21, 2001 plaintiff filed another EEO complaint.  This time he alleged

retaliation by Molenda.

On July 23, 2001, plaintiff claimed that someone sabotaged his telephone by

placing a sticky glue-like substance on it.  Plaintiff had no idea what was on the phone or

how it came to be there.  In response, the postal service replaced the phone.  At around

this same time, all the members of plaintiff's work unit were assigned new telephone extension numbers.  Plaintiff alleged that his co-workers received their new numbers before him, although he could not say how long he had to wait for his number.  He also claimed that after he was assigned a new telephone number, he received fewer phone calls.

On August 15, 2001, Molenda went on leave and appointed Deneka to handle certain tasks while she was away, such as collecting leave slips.  On August 17, 2001, plaintiff gave a leave slip to Deneka.  Plaintiff's request was apparently not transmitted to the appropriate person, and as a result, he lost 2 hours of pay.  However, he was reimbursed for the error.

On October 19, 2001, the EEO issue a final order dismissing all of plaintiff's claims of harassment and retaliation.

In November 2001, the lock on plaintiff's desk drawer became stripped.  Plaintiff complained that this was an act of vandalism, although he had no idea nor any proof as to how the damage occurred.  Plaintiff stated that he never checked to see if anything had been taken from the drawer.  On or about December 10, 2001, someone placed a note saying "keep out" on plaintiff's work cubicle.

In January 2002, plaintiff commenced his second lawsuit, *Johnson v. Potter*, 02-CV-6025, which was later re-numbered as case number 04-CV-6239 ("case 04-CV-6239").  In that case, plaintiff alleged that the foregoing instances of alleged mistreatment constituted retaliation under Title VII.

On or about November 29, 2002, the office Marketing Manager, Laura Lewis ("Lewis"), promoted Deneka to the position of Customer Service Representative, EAS-

11

13.  Plaintiff claimed that Deneka's promotion was retaliatory, since he was never notified of the opening, and since Deneka's promotion made his job less secure. However, plaintiff subsequently admitted that he had been out of work on sick leave when Deneka was promoted, and did not know whether or not the position had been posted.  Plaintiff also did not explain how Deneka's promotion made his position less secure.  On the other hand, defendant submitted proof that the position had been posted and that as a result of the posting, six individuals applied for the position.

At some point between March 2002 and February 14, 2003, plaintiff made a claim under the Family Medical Leave Act ("FMLA").  According to plaintiff, he was required to submit "excessive documentation" in support of his FMLA claim.  Nonetheless, plaintiff's FMLA leave request was apparently granted.

On February 18, 2003, plaintiff's pay check was short by $115.  After notifying his supervisors of the error, plaintiff was reimbursed the $115 a few days later.  Although plaintiff claimed the shorting of his pay was intentional, he admitted that he had no proof to support his theory.

On April 8, 2003, plaintiff filed an Amended Complaint [#20], which served as the operative complaint throughout the remainder of case number 04-CV-6239.  The complaint alleged "an ongoing pattern of retaliation."[1]

On April 21, 2003, plaintiff filed an EEO complaint regarding the FMLA claim, the one-day pay shortage, and Deneka's promotion.

On or about April 24, 2003, plaintiff wrote a letter to Lewis accusing her of

---

[1]*Id*. at ¶ 168.

sexually harassing him.  Lewis asked plaintiff to discuss the letter, but plaintiff refused.

Sometime after that, Lewis confronted plaintiff and said, "why don't you be a man and

talk about the letter." Lewis further stated that plaintiff's problem was that he was "seeing

dollar signs," and that "it wasn't going to happen off her career."  Lewis further said that

"she was aware that Plaintiff was afraid of losing his job, but that if anyone were to be

fired, he would be the first to go."  Although plaintiff characterizes this last statement as

a retaliatory threat, he admits that he was the least senior of the Complaint and Inquiry

Clerks, and that if "any of the three Claims and Inquiry positions need[ed] to be

abolished . . . [he] would be the next person in line to be terminated because of [his] lack

of seniority."[2]

Plaintiff left work on sick leave in May 2003, and never returned.  Plaintiff

resigned his position on August 15, 2003.  On September 5, 2003, plaintiff filed a

request for EEO "pre-complaint counseling," alleging that he had been constructively

discharged.  Plaintiff stated that his alleged constructive discharge "comes after

persistent management harassment and a 8/13/03 + 8/14/03 revelation that an

'involuntary deduction' of $6,808.00 by the agency to pay my creditors during a 1998

civil trial, has not been paid."

In May 2004, some nine months after plaintiff claims that he was constructively

discharged, plaintiff moved before this Court for leave to file a second amended

complaint in case 04-CV-6239.  The proposed second amended complaint contained a

claim for constructive discharge, and also included allegations of retaliation by Lewis

---

[2]*See*, 04-CV-6634, Amended Complaint [#2], ¶ ¶ 164-65.

13

concerning her comments to him in April 2003.  The Court denied the application to amend, finding that plaintiff had failed to demonstrate good cause for his delay in failing to move to amend the complaint beyond the deadline set by the Court.

After having a full opportunity to conduct discovery, the parties each subsequently moved for summary judgment in case 04-CV-6239.  By Decision and Order [#83] filed on March 2, 2005, the Court denied plaintiff's application for summary judgment, granted defendant's application, and dismissed the action.  In connection with those cross motions, it was undisputed that plaintiff had engaged in protected activity.  However, defendant asserted that none of the alleged acts of retaliation amounted to an "adverse employment action" under Title VII.  Plaintiff, relying on the Second Circuit's decision in *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999), argued that the adverse employment action consisted of "unchecked retaliatory co-worker harassment."  Plaintiff alternatively asserted that the alleged retaliatory acts by Molenda constituted adverse employment actions.  The Court rejected the "unchecked retaliatory co-worker harassment" theory, finding that plaintiff had failed to come forward with evidence that the alleged harassment by co-workers was either retaliatory or unchecked. The Court also found that defendant was entitled to judgment regarding the alleged retaliation by Molenda, in some instances because plaintiff had failed to demonstrate a prima facie case, and in other instances because plaintiff failed to come forward with evidentiary proof, establishing that the defendant's proffered reasons were false or pretextual.  The Court's summary judgment decision in case number 04-CV-6239 addressed all of the alleged acts of retaliation discussed above, except for the two which plaintiff did not assert in that case: 1) the claim that plaintiff was

14

required to submit excessive documentation in support of his FMLA claim; and 2) the

claim that Lewis retaliated against plaintiff in April 2003 by threatening his job.

While the summary judgment motions were pending in case number 04-CV-6239,

plaintiff filed the subject action on December 29, 2004.  The complaint in this action sets

forth the allegations of retaliation involving the FMLA claim and the alleged threats by

Lewis, along with all of the allegations of retaliation that were raised in case number 04-

CV-6239.  Based upon these allegations, plaintiff asserts two causes of action:

retaliation and constructive discharge. Amended Complaint [#2] ¶ ¶ 179-87.  With regard

to the retaliation claim, the complaint states, in relevant part:

> Plaintiff engaged in protected activity when he made both informal and
> formal EEO complaints on March 19, 2003, April 21, 2003, May 15, 2003,
> [and] June 12, 2003.  Shortly thereafter, he was subject to adverse
> employment action, including threats to terminate his position, falsifying his
> time card,[3] and ultimately, his constructive discharge in retaliation for
> having engaged in said protected activity.

Amended Complaint [#2], ¶ 180.  Based upon the dates contained in the paragraph

above, the retaliation claim is based solely upon alleged adverse employment actions

occurring on and after March 19, 2003.  The constructive discharge claim, on the other

hand, is based upon all of the instances of alleged retaliation discussed above, including

those occurring prior to March 19, 2003.  In other words, with the exception of the FMLA

incident and the alleged harassment by Lewis, the constructive discharge claim how

before the Court is based on the same alleged acts of retaliation which the Court

dismissed in case number 04-CV-6239.

---

[3]The alleged falsification of plaintiff's time card actually occurred in February 2003. See Amended
Complaint [#2] ¶ ¶ 123, 167, 169.

15

Prior to conducting any discovery in this action, defendant filed the subject motion seeking dismissal and/or summary judgment.  Defendant contends that the retaliation claim must be dismissed for several reasons.  First, defendant contends that the acts of alleged retaliation are barred by collateral estoppel, except for two, the FMLA incident and the alleged threats by Lewis.  And, as to those two incidents, defendant contends that plaintiff failed to establish a prima facie case of retaliation, since plaintiff suffered no adverse employment action.  Defendant further notes that the FMLA incident is not retaliatory for two additional reasons: first, the FMLA incident pre-dated the protected activity alleged by plaintiff, and second, there is no evidence that the employee who supposedly requested "excessive documentation" from plaintiff was even aware of plaintiff's protected activity.  Defendant also contends that the constructive discharge claim should be dismissed for several reasons.  First, defendant contends that, since the incidents which plaintiff relies on in support of his constructive discharge claim are the same incidents of alleged retaliation that the Court already dismissed, the constructive discharge claim is barred by collateral estoppel.  More specifically, defendant contends that since the incidents of alleged retaliation did not amount to "adverse employment actions," they necessarily fall short of establishing the aggravated circumstances required to establish a constructive discharge.  Alternatively, defendant contends that in any event, the acts of alleged retaliation upon which the constructive discharge claim is based fail, as a matter of law, to establish a constructive discharge.  Lastly, defendant argued that the constructive discharge claim had not been timely filed with the EEOC, and also had not been administratively exhausted.

In response to defendant's motion, plaintiff has filed an application under Rule

16

56(f).  Plaintiff states that he needs to conduct discovery before responding to defendant's motion, primarily so that he can establish that his constructive discharge claim was both timely filed with the EEOC and administratively exhausted.  Plaintiff also requests leave to obtain discovery from his own doctors, so that he can establish that it was medically necessary for him to resign from his position.

Defendant subsequently filed a reply, in which he concedes, for purposes of the subject motions, that plaintiff's constructive discharge claim was both timely and administratively exhausted.  Defendant maintains, however, that plaintiff is not entitled to discovery, and that the case should be dismissed.

On August 18, 2005, counsel for the parties appeared before the undersigned for oral argument of the subject motions.  Notably, during oral argument, plaintiff's counsel argued that acts which fail rise to the level of "adverse employment actions" under Title VII may nonetheless establish a constructive discharge.  Following oral argument the Court permitted plaintiff's counsel to supplement her brief on that issue of law.  The Court has now thoroughly considered the parties' submissions and the arguments of counsel.

STANDARDS OF LAW

*Rule 56*

The standard for granting summary judgment is well established.  Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment

17

bears the burden of establishing that no genuine issue of material fact exists. *See,*
*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a
prima facie showing that the standard for obtaining summary judgment has been
satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In
moving for summary judgment against a party who will bear the ultimate burden of proof
at trial, the movant may satisfy this burden by pointing to an absence of evidence to
support an essential element of the nonmoving party's claim." *Gummo v. Village of*
*Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317,
322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been
established, the burden then shifts to the non-moving party to demonstrate "specific
facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v.*
*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving
party must present evidence sufficient to support a jury verdict in its favor. *Anderson*,
477 U.S. at 249.  The parties may only carry their respective burdens by producing
evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts
contained in affidavits, attached exhibits, and depositions, must be viewed in the light
most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).
Summary judgment is appropriate only where, "after drawing all reasonable inferences
in favor of the party against whom summary judgment is sought, no reasonable trier of
fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d
Cir.1993).

     When a party is unable to produce affidavits in opposition to a summary judgment

motion, she may make an application pursuant to Rule 56(f), which states:

> **When Affidavits are Unavailable**.  Should it appear from the affidavits of
> a party opposing the motion [for summary judgment] that the party cannot
> for reasons stated present by affidavit facts essential to justify the party's
> opposition, the court may refuse the application for judgment or may order
> a continuance to permit affidavits to be obtained or depositions to be taken
> or discovery to be had or may make such other order as is just.

FED. R. CIV. P. 56(f).  In this Circuit, the requirements for obtaining relief under Rule 56(f)

are as follows:

> [A] party resisting summary judgment on the ground that it needs discovery
> in order to defeat the motion must submit an affidavit showing '(1) what
> facts are sought [to resist the motion] and how they are to be obtained, (2)
> how those facts are reasonably expected to create a genuine issue of
> material fact, (3) what effort affiant has made to obtain them, and (4) why
> the affiant was unsuccessful in those efforts.

*Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (citations

omitted).

A district court's decision to deny a request for additional discovery under Rule

56(f) is reviewed on appeal using the "abuse of discretion" standard. *Gualandi v. Adams*,

385 F.3d 236, 244 -245 (2d Cir. 2004).  However, in this regard, it is clear that as a

general rule, summary judgment is strongly disfavored where the non-moving party has

had no opportunity to conduct discovery. *Trammell v. Keane*, 338 F.3d 155, 161 (2d Cir.

2003) ("[O]nly in the rarest of cases may summary judgment be granted against a

plaintiff who has not been afforded the opportunity to conduct discovery.") (*quoting*

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000); *see also,*

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 627

(6th Cir. 2002) ("If the non-movant makes a proper and timely showing of a need for

discovery, the district court's entry of summary judgment without permitting him to conduct any discovery at all will constitute an abuse of discretion.").

*Title VII*

"Title VII makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Department of Correctional Services*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted).  However, "Title VII does not establish a 'general civility code' for the American workplace.  Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (citation omitted).

*Title VII Retaliation*

To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations and internal quotations omitted).  Making a complaint regarding harassment to one's supervisor is "protected activity" under Title VII. *Id.*

To make a prima facie showing of an adverse employment action, the plaintiff must show that the employer's actions caused a materially adverse change in the terms and conditions of employment. *Valentine v.Standard & Poors,* 50 F.Supp.2d 262, 283

(S.D.N.Y. 1999), *aff'd*, 205 F.3d 1327 (2d Cir. 2000).  Things such as "negative

evaluations alone, without any accompanying adverse result, are not cognizable." *Id*.  It

is well settled that

> [t]o be materially adverse a change in working conditions must be more
> disruptive than a mere inconvenience or an alteration of job
> responsibilities.  A materially adverse change might be indicated by a
> termination of employment, a demotion evidenced by a decrease in wage
> or salary, a less distinguished title, a material loss of benefits, significantly
> diminished material responsibilities, or other indices unique to a particular
> situation.

*Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)(Citations and

internal quotations omitted).  There is no "bright-line rule" for identifying an adverse

employment action, rather, "courts must pore over each case to determine whether the

challenged employment action reaches the level of 'adverse.'" *Richardson*, 180 F.3d at

446.

### Title VII Constructive Discharge

The elements of a claim for constructive discharge are as follows:

> A constructive discharge occurs when the employer, rather than acting
> directly, deliberately makes an employee's working conditions so
> intolerable that the employee is forced into an involuntary resignation.  In
> determining whether or not a constructive discharge has taken place, the
> trier of fact must be satisfied that the working conditions would have been
> so difficult or unpleasant that a reasonable person in the employee's shoes
> would have felt compelled to resign.

*Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (Citations and internal

quotation marks omitted).  However,

> [a] constructive discharge generally cannot be established . . . simply
> through evidence that an employee was dissatisfied with the nature of his
> assignments. . . .  Nor is it sufficient that the employee feels that the quality
> of his work has been unfairly criticized.  . . .  Nor is the standard for
> constructive discharge merely whether the employee's working conditions

were difficult or unpleasant.

*Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 -361 (2d Cir. 1993) (citations and internal quotation marks omitted).  Instead, the plaintiff "must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2347 (2004).

Title VII discrimination and retaliation claims are analyzed under the three-tier burden-shifting test "set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny." *Valentine v.Standard & Poors*, 50 F.Supp.2d at 281-82 (S.D.N.Y. 1999)(Citations and internal quotations omitted).  Under the first tier of the *McDonnell Douglas* test, the plaintiff must establish a prima facie case.  If the plaintiff establishes his prima facie case[4],

> the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge.  At this stage, the employer need only articulate--but need not prove-- the existence of a nondiscriminatory reason for its decision. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Once defendant meets its burden of production, the burden shifts back to plaintiff. Under the third tier of the *McDonnell Douglas* test, plaintiff bears the ultimate burden of proving that the reason proffered by the employer is a pretext for unlawful discrimination.  In order to survive a motion for summary judgment, plaintiff must establish a genuine issue of material fact as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Valentine*, 50 F.Supp.2d at 281-82 (Citations and internal quotations omitted).

---

[4]It is clear that "the burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (emphasis in original, citation and internal quotation marks omitted).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(citations and internal quotations omitted).  However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829.

ANALYSIS

Applying the foregoing principles of law to the facts of this case, the Court finds, at the outset, that plaintiff's cross-motion under Rule 56(f) should be denied.  The Court is mindful that, as discussed above, a Rule 56(f) application should ordinarily be granted where the plaintiff has conducted no discovery. *See, e.g., Czerw v. Ronald Billitier Elec., Inc.*, 03-CV-6613 (CJS) & 03-CV-6614 CJS, 2005 WL 1159425 at *8 (W.D.N.Y. May 17, 2005) (Siragusa, J.) ("[A] grant of summary judgment before any discovery has been conducted would be inappropriate, since plaintiff has not had a fair opportunity to show that defendants' articulated reasons are pretextual.").  However, the instant case is unusual in that plaintiff already had a full opportunity to conduct discovery in the prior proceeding between these parties involving essentially the same claims. *Sty-Lite Co. v. Eminent Sportswear Inc.*, No. 01 Civ. 3320 (CBM), 2002 WL 15650 at *5 (S.D.N.Y. Jan. 7, 2002) ("[A]lthough it is technically true that no discovery has taken place in the *present* incarnation of this case, [plaintiff] had ample opportunity to conduct full

23

discovery in the identical *prior* **action**.") (emphasis in original).   In fact, the parties were

conducting discovery in case number 04-CV-6239 as late as August 2003, and plaintiff

was deposed by defendant on August 14, 2003, the day before plaintiff resigned his

position.  Accordingly, the Court does not view this case as one in which plaintiff has had

no opportunity to conduct discovery, but on the contrary, views it as a case where

plaintiff has already had a full opportunity to do so.  Nor does the Court believe that the

additional discovery which plaintiff seeks would be helpful.  Most notably, the discovery

that plaintiff wants to obtain largely pertains to the timeliness of his constructive

discharge claim, and to the administrative exhaustion of that claim.  However, that

discovery is unnecessary, since as discussed above, defendant concedes, for purposes

of this motion, that the claim is both timely and administratively exhausted.  As for the

"discovery" that plaintiff wants to obtain from his own doctors, the Court sees no reason

why plaintiff could not have obtained such evidence already, since, in addition to being

available to him directly through the doctors, the information that he references is also

part of the administrative record in his social security disability case.  In any event, that

information, purportedly detailing plaintiff's subjective reactions to the alleged

harassment, would be irrelevant, since the standard to be applied in a constructive

discharge case is an objective one.  For all of these reasons, plaintiff's cross-motion

under Rule 56(f) is denied.  Plaintiff's alternative request for additional time to respond to

the summary judgment motion, in the event that the Court rejected his Rule 56(f)

application, is also denied. *See, Players, Inc. v. City of New York*, 371 F.Supp.2d 522,

534 (S.D.N.Y. 2005) (discussing reasons why a plaintiff whose Rule 56(f) application

fails is not necessarily entitled to an additional opportunity to oppose the summary

judgment motion).  Plaintiff made a tactical decision to proceed in the manner that he did in this case, and the Court declines to extend the briefing schedule. *See, Id.*

Next, turning to the merits of defendant's summary judgment motion, the Court finds that defendant is entitled to summary judgment on plaintiff's retaliation claims.  The Court previously granted summary judgment to defendant on all of the very same claims of retaliation alleged here except for two, the FMLA incident and the alleged threats by Lewis.  Moreover, as to the FMLA claim, plaintiff had an opportunity to include that claim in the previous action, but chose not to do so. Specifically, plaintiff was obviously aware of the FMLA incident at the time he amended his complaint in case number 02-CV-6239 on April 8, 2003.  Consequently, that claim, as well as all of the claims of retaliation that the Court specifically addressed in the prior action are barred by res judicata. *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 284 -285 (2d Cir. 2000) ("The doctrine of res judicata, or claim preclusion, holds that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.").

Even assuming, however, that the FMLA claim were not barred by res judicata, defendant would still be entitled to summary judgment.  Plaintiff has not established a prima facie case of retaliation concerning the FMLA incident for at least two reasons. First, plaintiff suffered no adverse employment action, but rather, he claims only that he was required to submit what he viewed as "excessive documentation" in support of his FMLA claim.  Second, plaintiff has come forward with no evidence to refute the affidavit of the FMLA claim administrator, who states that he was unaware of plaintiff's protected activity.

25

Similarly, plaintiff has failed to demonstrate a prima facie case of retaliation concerning the alleged threats by Lewis.  Specifically, even accepting that Lewis told plaintiff to "be a man," that she told him he was "seeing dollar signs," and that she threatened him by telling him that "if anyone was fired, he would be the first to go," these incidents do not establish an adverse employment action, either separately or together. Plaintiff does not claim to have suffered any concrete injury.  Even assuming, arguendo, that the most serious allegation, Lewis's alleged threat, met the low threshold for a prima facie showing, defendant came forward with a legitimate non-discriminatory reason for Lewis' comment about plaintiff being "the first to go," which is that he was the PS-5 clerk with the least seniority.  Moreover, defendant has presented evidence that the elimination of plaintiff's position, even though it never occurred, was warranted for legitimate business reasons.  Namely, the PS-5 clerks had too little work to do, and the PS-6 clerk had too much.  Plaintiff has not come forward with any evidentiary proof in admissible form to the contrary.  Accordingly, defendant is entitled to summary judgment on plaintiff's retaliation claims.

The Court will now consider plaintiff's constructive discharge claim.  The Court finds that where, as here, a plaintiff is claiming that he was constructively discharged based upon acts of retaliation,[5] the acts complained of must actually constitute retaliation under Title VII.  In *Suders*, the Supreme Court dealt with "one subset of Title VII constructive discharge claims: constructive discharge resulting from sexual

---

[5]*See*, Amended Complaint [#2] ¶ 4 (Plaintiff alleged that he was "subject to an ongoing pattern of retaliation between March 2002 through February 14, 2003 which then culminated in his constructive discharge on August 14, 2003.").  Plaintiff has never asserted in his lawsuits before this Court that he was subjected to a hostile work environment.

harassment, or "hostile work environment." *Pennsylvania State Police v. Suders*, 124 S.Ct. at 2352. The Supreme Court further noted that, "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case." *Id*. at 2356. Presumably then, when dealing with a claim for constructive discharge resulting from retaliation, actual retaliation is a necessary predicate. *See*, *Downey v. Isaac*, 622 F.Supp. 1125, 1133 (D.D.C. 1985) ("In sum, in a retaliatory constructive discharge case, *a plaintiff must show that he/she was retaliated against* because of his/her E.E.O. activity and that retaliation constituted intolerable working conditions in which a reasonable person in similar circumstances would have felt compelled to resign.") (emphasis added), *aff'd without opinion* 794 F.2d 753 (D.C. Cir. 1986); *Delashmutt v. Wis-Pak Plastics, Inc.*, 990 F.Supp. 689, 697 (N.D. Iowa 1998) (Stating, regarding "constructive discharge as the result of retaliatory conduct," that "if [a plaintiff] cannot prove retaliation, because she cannot prove any adverse employment action, then she *necessarily* cannot prove her employer made her working environment so intolerable as to establish any independent constructive discharge claim.") (emphasis added); *Amato v. Package Machinery Co.*, Civ. A. No. 81-0380 F, 1987 WL 7238 at *13 (D. Mass. Mar. 2, 1987) ("In analyzing a claim of retaliatory constructive discharge, plaintiff must show she was indeed retaliated against for asserting her rights under Title VII and that retaliation constituted intolerable work conditions leading to the alleged constructive discharge. Because the Court concludes plaintiff has failed to carry her burden of persuasion on the retaliation element, her constructive discharge claim must be denied.") (citation omitted). Consequently, since the Court has already determined,

both in the prior case[6] and in the instant case, that the actions complained of fail to establish actionable retaliation, plaintiff's constructive discharge claim based on retaliation must also fail.  Moreover, even if a reviewing court were to disagree that the dismissal of plaintiff's retaliation claims *necessarily* requires the dismissal of his retaliatory constructive discharge claim, this Court would alternatively find that the acts alleged by plaintiff fail to establish a constructive discharge as a matter of law.[7] *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985).

## CONCLUSION

Defendant's motion [#3] for summary judgment is GRANTED, plaintiff's cross-motion [#9] pursuant to Rule 56(f) is DENIED, and this action is DISMISSED.

SO ORDERED.

Dated: Rochester, New York
September 16, 2005

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[6]The Court agrees with defendant that the dismissal of the retaliation claims in the prior case has collateral estoppel effect in this case.

[7]For example, as discussed above at page 13, it appears from the timing of plaintiff's purported constructive discharge that the "last straw" that actually caused him to resign was not any of the alleged retaliation set forth above, but instead, was his belief that defendant had failed to pay his judgment creditors in connection with the settlement of his first lawsuit against defendant.  That allegation is not part of this case, and it is the Court's understanding that plaintiff's belief in that regard was later shown to be mistaken.