UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROLAND JOHNSON,

                                  Plaintiff,                    No. 04-CV-6634 CJS

        -vs-
                                                               DECISION AND ORDER

JOHN E. POTTER, Postmaster
General, United States Postal
Service,

                                  Defendant.
_____

APPEARANCES

For Plaintiff:                            Christina A. Agola, Esq.
                                          2100 First Federal Plaza
                                          28 East Main Street
                                          Rochester, New York 14614

For Defendant:                            Lynn S. Edelman, Esq.
                                          Assistant United States Attorney
                                          Federal Centre
                                          138 Delaware Avenue
                                          Buffalo, New York 14202

INTRODUCTION

        This is an employment discrimination action alleging, in relevant part, retaliation

and constructive discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title

VII"), as amended, 42 U.S.C. § 2000e *et seq.* The case is before the Court on remand

from the Second Circuit Court of Appeals, "for further consideration in light of *Burlington

N. & Santa Fe Ry. Co. v. White*, [548 U.S. 53,]126 S.Ct. 2405 (2006)," which was

decided after this Court granted summary judgment for Defendant.[1] (Decision and

_____

        [1]*Johnson v. Potter*, No. 05-5374-cv (2d Cir. Aug. 10, 2007).

1

Order, Docket No. [#21]).  Accordingly, now before the Court is Defendant's motion (Docket [#3]) to dismiss the amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure ("FRCP" 12(b)(6), and alternatively for summary judgment under FRCP 56, and  Plaintiff's cross-motion (Docket No. [#9]) for leave to conduct discovery pursuant to FRCP 56(f).  Also before the Court is Plaintiff's motion for reconsideration (Docket No. [#32]), filed after the case was remanded by the Second Circuit.  For the reasons that follow, Plaintiff's applications are denied, Defendant's application for summary judgment is granted, and this action is dismissed.

BACKGROUND

This is the third employment discrimination lawsuit which Plaintiff has filed against the United States Postal Service. *See, Johnson v. Henderson*, 90-CV-7138 CJS and *Johnson v. Potter*, 04-CV-6239 CJS.  Because they are relevant to the instant case, the Court will set forth the facts of the two previous lawsuits.  Plaintiff is an African American male who was hired by the United States Postal Service in Buffalo, New York in 1985. In September 1989, Plaintiff filed a complaint with the Postal Service's Equal Employment Opportunities Office ("EEO"), alleging that he had been denied a promotion to the position of "204B Supervisor" because of his race.  At that time Plaintiff's supervisor was Bill Mitchell ("Mitchell").  According to Plaintiff, Mitchell promised Plaintiff that he would be given another opportunity for promotion to 204B Supervisor, but later reneged on the promise.  Plaintiff subsequently commenced a lawsuit in this Court pursuant to Title VII entitled *Roland C. Johnson, Jr. v. William J. Henderson, Postmaster General, United States Postal Service*, Case No. 90-CV-7138 CJS(F) ("case 90-CV-

2

7138").

Plaintiff continued working at the Postal Service while his lawsuit proceeded. In or about September 1998, Plaintiff was promoted to the position of Claims and Inquiry Clerk, PS-5. At all relevant times thereafter, at the branch where Plaintiff worked, there were two other Claims and Inquiry Clerks, Judith Grove ("Grove") and Diana Chandler ("Chandler"). Grove and Chandler held the same job classification as Plaintiff, PS-5, but had more seniority than Plaintiff. Plaintiff's position was also referred to as "Lost and Found" and "Loose-In-The-Mails" clerk. In that capacity, Plaintiff was responsible for handling items inadvertently mailed, dropped into mailboxes, or lost at the post office, such as bank envelopes containing cash and checks, and other personal property. Plaintiff stored these items in a locked cabinet in his work area. Plaintiff was the only one of the three Claims & Inquiry Clerks who routinely handled lost and found money. Plaintiff also worked with Kathy Deneka ("Deneka"), whose title was Complaints and Inquiry Clerk, PS-6. Plaintiff's supervisor was Maryann Molenda ("Molenda").

Plaintiff's lawsuit in case 90-CV-7138 was tried before the undersigned in November 1998. On the third day of the trial, the parties agreed to a complete settlement. In exchange for settling the lawsuit, defendant agreed to pay Plaintiff $90,000.00 and restore 496 hours of sick leave. Plaintiff contends that after the lawsuit was settled, his immediate supervisor, Molenda, began to harass him and retaliate against him.

The alleged post-lawsuit harassment began with a disagreement between Plaintiff and Molenda over the procedures Plaintiff was to use for inventorying and storing certain items of mail. According to Plaintiff,

3

> supervisor Molenda directed me to keep a special 'log' of every single time
> I went into my overhead cabinet where money and registered mail was
> kept, in addition to the normal log that identified 'Matters Without Address
> Found in the Mails' that I was required to keep.  No other postal employee
> under Molenda's supervision was subject to this treatment; indeed, my
> predecessor Lester Morris was only required to maintain the 'Matters
> Without Address Found in Mails' log.

Johnson Aff., 04-CV-6239 [#45] ¶ ¶ 37-38.  While Plaintiff claims that "no other postal

employee [was subjected] to such treatment," as indicated above, Plaintiff was the only

employee who routinely handled lost and found money.  Plaintiff's specific objection was

that his predecessor had not been required to keep such a log.  Molenda described the

event differently, stating that Plaintiff

> was off from work for approximately 3 days during the early portion of
> November 1998.  When he returned he stated his top drawer was opened
> and that he remembers locking it when he left.  He mentioned that there
> are only two sets of keys; one he has and one I have.  He requested I sign
> off that he is not responsible for missing items.  I denied his request and he
> filed a grievance where an agreement was reached.

*Id.* , Ex. W.  The agreement referred to by Molenda, reached between the Postal Service

and Plaintiff's union, in settlement of Plaintiff's grievance, provided, in relevant part:

> Management agrees to implement the following actions:
>
> 1) Clerk will deposit all monies on a daily basis.
>
> 2) Management will establish a inventory log, for all loose in the mail items
> kept under lock and key.  Clerk will annotate on the inventory log final
> disposition of all items.
>
> 3) Manager, Consumer Affairs will arrange to have locks changed on
> drawers and cabinets.
>
> 4) Grievant's supervisor will maintain duplicate key.  Whenever duplicate
> key is issued, the Mgr CA will record the individual name, time/date, and
> return time/date.

*Id.*, Ex. E.  Thus, while Plaintiff claimed that Molenda was retaliating against him by

requiring him to keep an inventory log, the parties' subsequent agreement expressly provided for the creation of such a log.

In May 1999, Karl Anderson ("Anderson"), one of Plaintiff's supervisors, commented that Plaintiff's work area was "the dark side of the room." Plaintiff viewed the comment as a racial slur, although Anderson maintained that he was making a joke based upon the movie "Star Wars." In papers submitted in connection with a summary judgment motion, Plaintiff suggested that Anderson's comment was racially motivated because Plaintiff and another black employee were the only African-Americans on the side of the room to which Anderson referred. However, in a deposition, Plaintiff testified that there were African Americans stationed on both sides of the room when Anderson made his remark.

On or about May 27, 1999, Plaintiff and his union representative met with the Postal Service's District Manager, Nicholas Fabozzi ("Fabozzi"), to discuss the alleged harassment by Molenda and the "dark side" comment by Anderson.

On or about December 2, 1999, Molenda left a post-it note on Plaintiff's telephone, directing him to forward calls when he was away from his desk. Plaintiff contends that he was singled out in this regard, and that Molenda did not tell other employees to forward their calls until after he complained of disparate treatment. Molenda, however, maintains that she left similar notes on all of her employees' phones at different times.

In January 2000, Plaintiff claimed to have overheard Grove and Deneka having a conversation in which they made comments which, although not about him, he found racially-offensive. Plaintiff states that "they were speaking about 'blacks not wanting to

work and standing on the corner selling drugs and stuff.'" Plaintiff reported the incident to

Molenda, who responded by issuing a memo that stated:

> It has come to my attention that employee(s) are using profane or obscene
> language in the office. This type of behavior will not be tolerated by
> management. This language is offensive to others. We must keep in mind
> that this office is a customer service officer, where at no given time [sic],
> customers are in our office or on the telephone who may also hear this
> type of language. This also relates to conversations amongst one another
> (when others can hear you) that may be offensive to others. Our
> workplace is a professional place of business and we must conduct
> ourselves in this manner. Thank you for your cooperation.

Pl. Supp. Appendix, 04-CV-6239 [#80], Ex. L. Although the memo was addressed to all

of the employees in the office, and was sent in response to Plaintiff's complaint, Plaintiff

maintained that the memo was intended to reprimand him for having complained.

On or about February 16, 2000, Molenda told Plaintiff to "drop everything" and

handle claims while she and Deneka "had a personal conversation over coffee in her

office." On or about March 6, 2000, Plaintiff and his union representative again met with

Fabozzi to complain about what Plaintiff viewed as a continuing pattern of harassment

by Molenda, as well as Molenda's preferential treatment of Deneka. Plaintiff asked that

Molenda be required to attend "sensitivity training," but Fabozzi dismissed the idea.

On or about August 18, 2000, Molenda called a unit meeting and announced that

she was taking duties that had been performed by the Claims and Inquiry department in

Rochester, and was adding them to the Buffalo Claims & Inquiry department's duties.

Additionally, Molenda directed the Rochester PS-5 Claims & Inquiry clerks to answer

telephone inquiries received on a newly-installed "1-800" assistance line. Plaintiff initially

alleged that Molenda used the occasion to retaliate against him by assigning additional

duties only to him. However, he later admitted that the other PS-5 Claims and Inquiry

Clerks were also given additional duties similar to the ones he was given.[2]  Nonetheless,

Plaintiff continued to claim that Deneka was treated preferentially because she did not

receive any additional PS-5 work, even though she was a PS-6 clerk.

Plaintiff also claimed he told Molenda that he was overwhelmed with work and

needed help, but she refused to assist him.  According to Plaintiff, Molenda told him that,

if anything, she would consider creating an additional position for someone to assist

Deneka in her work.

On August 25, 2000, Plaintiff filed another EEO charge.  In the EEO complaint,

Plaintiff described an incident on August 18, 2000, as follows:

> I was 'combatively' approached by Consumer Affairs Manager Maryann
> Molenda.  She remarked, 'I need to review the way you are doing things,
> especially the way you handle the money.'  This overt racist statement has
> numerous + frequent [sic] since Sept. 1998.

Pl. Appendix to Local Rule 56.1 Counterstatement of Facts, 04-CV-6239 [#71], Exhibits I

& U.  However, Plaintiff subsequently gave a different version of those events:

> Immediately *after* Plaintiff filed his August 25, EEO charge, Molenda
> aggressively approached Plaintiff in front of others and remarked 'I want to
> review the way you are doing things, *the way you are doing them is
> probably wrong*.' (Exhibit A, p. 107, Lines 20-23).

Johnson Aff., 04-CV-6239 [#66] ¶ 70.

Plaintiff alleged that Molenda subsequently had him bring trays of mail to her for

---

[2]Molenda, in an affidavit submitted in connection with a subsequent EEO investigation, described the situation as follows: "I also had 2 Claims & Inquiry clerk positions in Rochester.  Due to technology, the workload diminished and those 2 positions were abolished. An 800 line was put in for Rochester customers to call and that line is on all 3 level 5 Claims & Inquiry clerks phones in Buffalo, not just [Plaintiff's].  A light blinks when there is a call and the first to pick it up takes the call.  If no one answers, it rolls over to Claims & Inquiry Clerk Bill Maturski's voice mail.  The line is not on the level 6's phone (Kathy Deneka's) since the intent of the line was to assist customers in Rochester with Claims & Inquiry (level 5 positions)." Pl. Appendix to Local Rule 56.1 Counterstatement 04-CV-6239 [#71], Ex. T.

inspection, and kept lists of his tasks, but did not do so for other employees. Plaintiff

also claimed that Molenda continued to scrutinize his handling of money. Plaintiff further

maintained that Molenda made a list of his activities, and gave it to the union as proof

that Plaintiff "did not have enough work to do." On August 30, 2000, Molenda directed

that certain work which Plaintiff had been performing be performed by another unit

known as the "Nixie Unit." On October 11, 2000, Molenda directed the Nixie Unit not to

send trays of mail to Plaintiff, purportedly to avoid double handling. Molenda also told

Plaintiff to discontinue his usual practice of retrieving mail from the Nixie Unit for

processing, because she would get it herself. According to Molenda,

> everyone's work was monitored, tallied, counted and recorded, not just
> [Plaintiff's]. This was done primarily because of the changes that occurred
> in Claims & Inquiry workload being done electronically in addition to other
> changes that HQ made nationally that affected Claims & Inquiry workload.
> With the ["]loose in the mails["] which [Plaintiff] works on, I wanted to see
> what Nixie [Unit] rewrap was giving him. [Nixie Unit has] been know to use
> us as a dumping ground. I have done this practice with the previous
> claims and inquiry clerk who now is retired. As a manager, the above
> monitoring should occur to know the workload and to correct any
> deficiencies found.

Pl. Appendix to Local Rule 56.1 Counterstatement 04-CV-6239 [#71] Ex. T. Plaintiff,

however, claimed that Molenda was scrutinizing his work in order to harass him, and in

order to decrease his workload so that she could justify eliminating his position.

In February 2001, Molenda sent a letter to the president of Plaintiff's labor union

and to the Postal Service's labor relations specialist, notifying them that she intended to

eliminate Plaintiff's PS-5 position and create a new PS-6 position. Molenda's letter

stated:

> This letter is to officially notify you, as outlined in Article 37 of the National
> Agreement, that position 2336157, Claims & Inquiry Clerk, currently held

8

by Roland Johnson, is under consideration to be rescinded and to post a Complaints & Inquiry Clerk position, level 6.   The workload for Claims & Inquiry Clerks [PS-5] will continue to decrease and the workload impacted by the following events:

> In Fall of 2000, signature capture (electronic filing) took place.  This sharply reduced the workload for Claims & Inquiry eliminating the manual filing and the manual lookups for accountable mail.

> Because of the electronic filing of accountable mail, filing claims is conducted in a shorter time frame.

> Effective September 1999, the Postal Inspection Service changed the procedures in handling PS Form 1510 (mail loss/rifling report) which sharply reduced the workload for Claims & Inquiry.

> A decrease in claims being processed took effect in 1997 because of local adjudication with unnumbered claims. Streamlining efforts on overall claims process is under review by Headquarters.

> The National Call Centers that are in place and their continued national roll out will impact the number of calls.

> Headquarters is currently identifying process improvements for handling loose in the mail items at the point of discovery. A finished product should be seen sometime in Spring.

The workload for Complaints & Inquiry [PS-6] has steadily increased. Customers have additional means in contacting us with their service issues th[a]n just by telephone or in writing.  Service issues are also received electronically through the National Call Centers and the Internet.  A review of the workload by the Claims & Inquiry Clerks and Complaints & Inquiry Clerk has been conducted and warrants this decision.  I am asking for your input by February 21, 2001.

Molenda Aff., 04-CV-6239 [#79] Ex. A.  There is no indication in the record that the

union responded to Molenda's letter.  On or about February 14, 2001, Molenda told

Plaintiff that she was going to eliminate his position, and create a new Complaints and

Inquiry Clerk position as a PS-6 position, for the purpose of assisting Deneka.  On

March 7, 2001, Molenda notified the union that she was going to "revert" Plaintiff's position and post a new PS-6 position. Plaintiff complained that Molenda was singling him out for retaliation. In response to that charge, Molenda told the EEO that

> [Plaintiff] is taking this personally. It is not HIS position I want to eliminate. I observed that there was not enough work for 3 level 5 Claims & Inquiry clerks, however, there was enough workload for another Complaints & Inquiry Clerk position. This occurred because of workload and volume that I conducted [sic] for several months when changes began in Claims & Inquiry workload due to HQ changes made nationally. While it is true, that because [Plaintiff] is the junior employee, it will be the position he occupies, but the reason for that is contractual, not personal, based on unit seniority.

Pl. Appendix to Local Rule 56.1 Counterstatement, 04-CV-6239 [#71] Ex. T. Plaintiff claimed that Molenda's proposal violated the collective bargaining agreement between the union and the postal service. However, the union did not support him in that regard. Plaintiff subsequently filed complaints with both the union and the Merit System Protection Board. On April 30, 2001, the postal service advised Plaintiff that it was "rescinding" its attempt to eliminate the position at that time, but would review the matter in six months.

On May 21, 2001 Plaintiff filed another EEO complaint. This time he alleged retaliation by Molenda.

On July 23, 2001, Plaintiff claimed that someone sabotaged his telephone by placing a sticky glue-like substance on it. Plaintiff had no idea what was on the phone or how it came to be there. In response, the postal service replaced the phone. At around this same time, all the members of Plaintiff's work unit were assigned new telephone extension numbers. Plaintiff alleged that his co-workers received their new numbers before him, although he could not say how long he had to wait for his number. He also

10

claimed that after he was assigned a new telephone number, he received fewer phone calls.

On August 15, 2001, Molenda went on leave and appointed Deneka to handle certain tasks while she was away, such as the collection of leave slips. On August 17, 2001, Plaintiff gave a leave slip to Deneka. Plaintiff's request was apparently not transmitted to the appropriate person, and as a result, he lost 2 hours of pay. However, he was reimbursed for the error.

On October 19, 2001, the EEO issue a final order dismissing all of Plaintiff's claims of harassment and retaliation.

In November 2001, the lock on Plaintiff's desk drawer became stripped. Plaintiff complained that this was an act of vandalism, although he had no idea nor any proof as to how the damage occurred. Plaintiff stated that he never checked to see if anything had been taken from the drawer. On or about December 10, 2001, someone placed a note saying "keep out" on Plaintiff's work cubicle.

In January 2002, Plaintiff commenced his second lawsuit, *Johnson v. Potter*, 02-CV-6025, which was later re-numbered as case number 04-CV-6239 ("case 04-CV-6239"). In that case, Plaintiff alleged that the foregoing instances of alleged mistreatment constituted retaliation under Title VII.

On or about November 29, 2002, the office Marketing Manager, Laura Lewis ("Lewis"), promoted Deneka to the position of Customer Service Representative, EAS-13. Plaintiff claimed that Deneka's promotion was retaliatory, since he was never notified of the opening. However, Plaintiff subsequently admitted that he had been out of work on sick leave when Deneka was promoted, and that he did not know whether or

11

not the position had been posted. On the other hand, Defendant submitted proof that the position had been posted and that as a result of the posting, six individuals applied for the position.

At some point between March 2002 and February 14, 2003, Plaintiff made a claim under the Family Medical Leave Act ("FMLA"). According to Plaintiff, an administrative employee required him to submit "excessive documentation" in support of his FMLA claim. Nonetheless, Plaintiff's FMLA leave request was apparently granted.

On February 18, 2003, Plaintiff's pay check was short by $115. After notifying his supervisors of the error, Plaintiff was reimbursed the $115 a few days later. Although Plaintiff claimed the shorting of his pay was intentional, he admitted that he had no proof to support his theory.

On April 8, 2003, Plaintiff filed an Amended Complaint [#20], which served as the operative complaint throughout the remainder of case number 04-CV-6239. The complaint alleged "an ongoing pattern of retaliation."[3]

On April 21, 2003, Plaintiff filed an EEO complaint regarding the FMLA "excessive documentation" incident, the one-day pay shortage, and Deneka's promotion.

On or about April 24, 2003, Plaintiff wrote a letter to Lewis accusing her of sexually harassing him. Lewis asked Plaintiff to discuss the letter, but Plaintiff refused. Sometime after that, Lewis confronted Plaintiff and said, "why don't you be a man and talk about the letter." Lewis further stated that Plaintiff's problem was that he was "seeing dollar signs," and that "it wasn't going to happen off her career." Lewis further

---

[3]*Id.* at ¶ 168.

said that "she was aware that Plaintiff was afraid of losing his job, but that if anyone were to be fired, he would be the first to go."  Although Plaintiff characterized this last statement as a retaliatory threat, he admitted that he was the least senior of the Complaint and Inquiry Clerks, and that if "any of the three Claims and Inquiry positions need[ed] to be abolished . . . [he] would be the next person in line to be terminated because of [his] lack of seniority."[4]

Plaintiff left work on sick leave in May 2003, and never returned.  Plaintiff resigned his position on August 15, 2003.  On September 5, 2003, Plaintiff filed a request for EEO "pre-complaint counseling," alleging that he had been constructively discharged.  Plaintiff stated that his alleged constructive discharge "comes after persistent management harassment and a 8/13/03 + 8/14/03 revelation that an 'involuntary deduction' of $6,808.00 by the agency to pay my creditors during a 1998 civil trial, has not been paid."

In May 2004, some nine months after Plaintiff claims that he was constructively discharged, Plaintiff moved before this Court for leave to file a second amended complaint in case 04-CV-6239.  The proposed second amended complaint contained a claim for constructive discharge, and also included allegations of retaliation by Lewis concerning her comments to him in April 2003.  The Court denied the application to amend, finding that Plaintiff had failed to demonstrate good cause for his delay in failing to move to amend the complaint beyond the deadline set by the Court.

After having a full opportunity to conduct discovery, the parties each subsequently

---

[4]*See*, 04-CV-6634, Amended Complaint [#2], ¶ ¶ 164-65.

moved for summary judgment in case 04-CV-6239. By Decision and Order [#83] filed on March 2, 2005, the Court denied Plaintiff's application for summary judgment, granted Defendant's application, and dismissed the action. In connection with those cross motions, it was undisputed that Plaintiff had engaged in protected activity. However, Defendant asserted that none of the alleged acts of retaliation amounted to an "adverse employment action" under Title VII. Plaintiff, relying on the Second Circuit's decision in *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999), argued that the adverse employment action consisted of "unchecked retaliatory co-worker harassment." Plaintiff alternatively asserted that the alleged retaliatory acts by Molenda constituted adverse employment actions. The Court rejected the "unchecked retaliatory co-worker harassment" theory, finding that Plaintiff had failed to come forward with evidence that the alleged harassment by co-workers was either retaliatory or unchecked. The Court also found that Defendant was entitled to judgment regarding the alleged retaliation by Molenda, in some instances because Plaintiff had failed to demonstrate a prima facie case, and in other instances because Plaintiff failed to come forward with evidentiary proof, establishing that the Defendant's proffered reasons were false or pretextual. The Court's summary judgment decision in case number 04-CV-6239 addressed all of the alleged acts of retaliation discussed above, except for the two which Plaintiff did not assert in that case: 1) the claim that Plaintiff was required to submit excessive documentation in support of his FMLA claim; and 2) the claim that Lewis retaliated against Plaintiff in April 2003 by threatening his job. Plaintiff appealed, and on December 15, 2005, the Second Circuit affirmed this Court's judgment. (USCA Case number 05-1231-cv).

14

On December 29, 2004, while the summary judgment motions were pending in case number 04-CV-6239, Plaintiff filed the subject action. The complaint set forth the allegations of retaliation involving the FMLA claim and the alleged threats by Lewis, along with all of the allegations of retaliation that were raised in case number 04-CV-6239. Based upon these allegations, Plaintiff asserted two causes of action: retaliation and constructive discharge. Amended Complaint [#2] ¶ ¶ 179-87. With regard to the retaliation claim, the complaint stated, in relevant part:

> Plaintiff engaged in protected activity when he made both informal and formal EEO complaints on March 19, 2003, April 21, 2003, May 15, 2003, [and] June 12, 2003. Shortly thereafter, he was subject to adverse employment action, including threats to terminate his position, falsifying his time card,[5] and ultimately, his constructive discharge in retaliation for having engaged in said protected activity.

Amended Complaint [#2], ¶ 180. Based upon the dates contained in the paragraph above, the retaliation claim was based solely upon alleged adverse employment actions occurring on and after March 19, 2003. The constructive discharge claim, on the other hand, was based upon all of the instances of alleged retaliation discussed above, including those occurring prior to March 19, 2003. In other words, with the exception of the FMLA incident and the alleged harassment by Lewis, the constructive discharge claim was based on the retaliation claims which the Court had dismissed in case number 04-CV-6239.

Prior to conducting any discovery in this action, Defendant filed the subject motion seeking dismissal and/or summary judgment. Defendant contended that the

---

[5] The alleged falsification of Plaintiff's time card actually occurred in February 2003. See Amended Complaint [#2] ¶ ¶ 123, 167, 169.

retaliation claim should be dismissed for several reasons. First, Defendant argued that the acts of alleged retaliation were barred by collateral estoppel, except for the FMLA incident and the alleged threats by Lewis. And, as to those two incidents, Defendant maintained that Plaintiff could not establish a prima facie case of retaliation, since Plaintiff suffered no adverse employment action. Defendant further noted that the FMLA incident was not retaliatory for two additional reasons: First, the FMLA incident pre-dated the protected activity alleged by Plaintiff; and second, there was no evidence that the employee who supposedly requested "excessive FMLA documentation" from Plaintiff was aware of Plaintiff's protected activity. Defendant also argued that the constructive discharge claim should be dismissed for several reasons. First, Defendant contended that, since the incidents which Plaintiff relied on in support of his constructive discharge claim were the same incidents of alleged retaliation that the Court already dismissed, the constructive discharge claim was barred by collateral estoppel. More specifically, Defendant maintained that since the incidents of alleged retaliation did not amount to "adverse employment actions," they necessarily fell short of establishing the aggravated circumstances required to establish a constructive discharge. Alternatively, Defendant contended that the acts of alleged retaliation upon which the constructive discharge claim was based failed, as a matter of law, to establish a constructive discharge. Lastly, Defendant argued that the constructive discharge claim had not been timely filed with the EEOC, and also had not been administratively exhausted.

In response to Defendant's motion, Plaintiff filed an application under Rule 56(f). Plaintiff stated that he needed to conduct discovery before responding to Defendant's motion, primarily so that he could establish that his constructive discharge claim was

16

both timely filed with the EEOC and administratively exhausted.  Plaintiff also requested leave to obtain discovery from his own doctors, so that he could establish that it was medically necessary for him to resign his position.

Defendant subsequently filed a reply, conceding, for purposes of the subject motions, that Plaintiff's constructive discharge claim was both timely filed and administratively exhausted.  Defendant maintained, however, that Plaintiff was not entitled to discovery, and that the case should be dismissed.

On August 18, 2005, counsel for the parties appeared before the undersigned for oral argument of the subject motions.  Notably, during oral argument, Plaintiff's counsel contended that acts which fail rise to the level of "adverse employment actions" under Title VII may nonetheless establish a constructive discharge.

On September 16, 2005, the Court issued a Decision and Order [#21], granting Defendant's application for summary judgment, denying Plaintiff's cross-motion for leave to conduct discovery pursuant to Fed. R. Civ. P. 56(f), and dismissing the action.  The Court granted summary judgment on Plaintiff's retaliation claims, for several reasons. As mentioned above,  Plaintiff had alleged that he was retaliated against in numerous ways, including that: 1) he was required to submit "excessive documentation" in support of an FMLA claim that was granted; and 2) Supervisor Laura Lewis ("Lewis") confronted Plaintiff, after he accused her of sexually harassing him, and told him, *inter alia*, that he was "seeing dollar signs," that "it wasn't going to happen off her career," and that "she was aware that Plaintiff was afraid of losing his job, but that if anyone were to be fired, he would be the first to go." (Decision and Order [#21] at 12-13).  As for the comment about being the "first to go," it is undisputed that Plaintiff was the least senior PS-5

17

"Complaint and Inquiry Clerk," and that a PS-5 clerk position was being considered for elimination ostensibly because of changes in technology and workload. The Court found that all of the alleged instances of retaliation, except for Lewis's alleged threats, were barred by claim preclusion/*res judicata. Id.* at 25.[6] Alternatively, the Court found that neither the FMLA "excessive documentation" incident, nor Lewis's alleged threats, amounted to "adverse employment actions." *Id.* at 25-26. Significantly, in setting forth the principles of law applicable to claims for retaliation, the Court recited the then-settled law that, "[t]o make a prima facie showing of an adverse employment action, the Plaintiff must show that the employer's actions caused a materially adverse change in the terms and conditions of employment." *Id.* at 20 (*citing Valentine v. Standard & Poors*, 50 F.Supp.2d 262, 283 (S.D.N.Y. 1999), *aff'd*, 205 F.3d 1327 (2000)).

Additionally, the Court found that Defendant would be entitled to summary judgment on the FMLA excessive documentation claim *in any event*, since it was undisputed that the person who asked for the "excessive documentation" was unaware that Plaintiff had engaged in protected activity. *Id.* at 25. Similarly, the Court ruled that even if Lewis's "threat" that Plaintiff would be "the first to go" amounted an adverse employment action, Defendant was nevertheless entitled to summary judgment, since the potential elimination of Plaintiff's position, which ultimately never occurred, was "warranted for legitimate business reasons." *Id.* at 26.

---

[6]The Court wrote: "The Court previously granted summary judgment to defendant on all of the very same claims of retaliation alleged here except for two, the FMLA incident and the alleged threats by Lewis. Moreover, as to the FMLA claim, Plaintiff had an opportunity to include that claim in the previous action, but chose not to do so. Specifically, Plaintiff was obviously aware of the FMLA incident at the time he amended his complaint in case number 02-CV-6239 on April 8, 2003. Consequently, that claim, as well as all of the claims of retaliation that the Court specifically addressed in the prior action are barred by res judicata." (Decision and Order [#21] at 25) (Citation omitted).

Plaintiff appealed, and on June 7, 2006, the United States Court of Appeals for the Second Circuit issued a Summary Order affirming this Court's decision. Plaintiff then applied for a writ of certiorari to the United States Supreme Court. On June 22, 2006, the Supreme Court issued its decision in *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405 (2006). The *Burlington Northern* decision addressed two issues concerning Title VII's anti-retaliation provision: "Does that provision confine actionable retaliation to activity that affects the terms and conditions of employment? And how harmful must the adverse actions be to fall within its scope?" *Id.*, 126 S.Ct. at 2408. The Supreme Court answered the first question in the negative, and held that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 2414. As for the second issue, the Supreme Court held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 2415 (citations and internal quotations omitted).

On June 25, 2007, the Supreme Court granted Plaintiff's petition for writ of certiorari, vacated the judgment, and remanded the case to the Second Circuit "for further consideration in light of" the *Burlington Northern* decision. *Johnson v. Potter*, 127 S.Ct. 3003 (Mem) (Jun. 25, 2007). On August 10, 2007, the Second Circuit vacated this Court's judgment and remanded the case "for further proceedings consistent with the order of the United States Supreme Court." *Johnson v. Potter*, No. 05-5374-cv (2d Cir. Aug. 10, 2007).

Subsequently, this Court issued an Order [#28], granting the parties permission to file supplemental memorandums of law, "addressing the effect of the *Burlington Northern* decision on defendant's summary judgment motion." Defendant filed a memo of law, arguing that summary judgment was still appropriate in light of the *Burlington Northern* decision. (Memo of Law and Supplemental Appendix, Docket Nos. [##30, 31]). Specifically, Defendant maintained that under the standard set forth in *Burlington Northern*, the incidents identified by Plaintiff still failed to amount to actionable retaliation. Defendant further observed that, even if the complained-of incidents were sufficiently adverse, summary judgment was still appropriate, for the reasons explained in the Court's prior decision, which were not affected by the *Burlington Northern* decision. Finally, Defendant contended that the *Burlington Northern* decision did not alter the Court's prior rulings concerning res judicata, constructive discharge, or Plaintiff's Rule 56(f) application.

Plaintiff, however, disagreed, and argued that the *Burlington Northern* decision required the Court to reconsider its rulings as to the retaliation and constructive discharge claims, as well as its ruling on *res judicata*.[7] In that regard, Plaintiff filed a "Motion for Reconsideration" [#32], which maintains that: 1) *Burlington Northern* changed the relevant legal standard, therefore res judicata does not apply; and 2) under the *Burlington* standard, Plaintiff has pleaded claims for retaliation and constructive discharge.

---

[7]As mentioned above, in its decision granting summary judgment to Defendant, the Court held that with the exception of the alleged threat by Lewis, all of the Plaintiff's retaliation claims were barred by *res judicata*, or claim preclusion, since they either were raised or could have been raised in Plaintiff's earlier actions. Plaintiff mistakenly characterizes that ruling as involving the separate doctrine of collateral estoppel, or issue preclusion. (Plaintiff's Memo of Law [#32] at 11).

Having further considered the various motions in light of *Burlington Northern*, the Court again finds that Defendant is entitled to summary judgment.

STANDARDS OF LAW

*Rule 56*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996). Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The parties may only carry their respective burdens by producing

evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts

contained in affidavits, attached exhibits, and depositions, must be viewed in the light

most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Summary judgment is appropriate only where, "after drawing all reasonable inferences

in favor of the party against whom summary judgment is sought, no reasonable trier of

fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d

Cir.1993).

When a party is unable to produce affidavits in opposition to a summary judgment

motion, she may make an application pursuant to Rule 56(f), which states:

> **When Affidavits are Unavailable**.  Should it appear from the affidavits of
> a party opposing the motion [for summary judgment] that the party cannot
> for reasons stated present by affidavit facts essential to justify the party's
> opposition, the court may refuse the application for judgment or may order
> a continuance to permit affidavits to be obtained or depositions to be taken
> or discovery to be had or may make such other order as is just.

FED. R. CIV. P. 56(f).  In this Circuit, the requirements for obtaining relief under Rule 56(f)

are as follows:

> [A] party resisting summary judgment on the ground that it needs discovery
> in order to defeat the motion must submit an affidavit showing '(1) what
> facts are sought [to resist the motion] and how they are to be obtained, (2)
> how those facts are reasonably expected to create a genuine issue of
> material fact, (3) what effort affiant has made to obtain them, and (4) why
> the affiant was unsuccessful in those efforts.

*Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (citations

omitted).

A district court's decision to deny a request for additional discovery under Rule

56(f) is reviewed on appeal using the "abuse of discretion" standard. *Gualandi v. Adams*,

385 F.3d 236, 244 -245 (2d Cir. 2004).  However, in this regard, it is clear that as a

general rule, summary judgment is strongly disfavored where the non-moving party has had no opportunity to conduct discovery. *Trammell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) ("[O]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.") (*quoting Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000); *see also, Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 627 (6th Cir. 2002) ("If the non-movant makes a proper and timely showing of a need for discovery, the district court's entry of summary judgment without permitting him to conduct any discovery at all will constitute an abuse of discretion.").

*Title VII*

"Title VII makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Department of Correctional Services*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted; abrogated on other grounds). However, "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (citation omitted).

*Title VII Retaliation*

To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal

connection between the protected activity and the adverse employment action." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations and internal quotations omitted); *see also, Nieves v. Angelo, Gordon & Co.*, No. 07-2330-cv, 2009 WL 1910970 at *2 (2d Cir. Jul. 6, 2009).  Making a complaint regarding harassment to one's supervisor is "protected activity" under Title VII. *Cruz* v. *Coach Stores, Inc.,* 202 F.3d at 566.  To be actionable, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. at 2415.

<em>Title VII Constructive Discharge</em>

The elements of a claim for constructive discharge are as follows:

> A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.  In determining whether or not a constructive discharge has taken place, the trier of fact must be satisfied that the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

*Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (Citations and internal quotation marks omitted).  However,

> [a] constructive discharge generally cannot be established . . . simply through evidence that an employee was dissatisfied with the nature of his assignments. . . .  Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized.  . . .  Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant.

*Stetson v. NYNEX Service Co.*, 995 F.2d 355, 360 -361 (2d Cir. 1993) (citations and internal quotation marks omitted).  Instead, the plaintiff "must show that the abusive

working environment became so intolerable that her resignation qualified as a fitting response." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 2347 (2004).

Title VII discrimination and retaliation claims are analyzed under the three-tier burden-shifting test "set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny." *Valentine v.Standard & Poors*, 50 F.Supp.2d at 281-82 (S.D.N.Y. 1999)(Citations and internal quotations omitted). Under the first tier of the *McDonnell Douglas* test, the plaintiff must establish a prima facie case. If the plaintiff establishes his prima facie case[8],

> the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's discharge. At this stage, the employer need only articulate--but need not prove-- the existence of a nondiscriminatory reason for its decision. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Once defendant meets its burden of production, the burden shifts back to plaintiff. Under the third tier of the *McDonnell Douglas* test, plaintiff bears the ultimate burden of proving that the reason proffered by the employer is a pretext for unlawful discrimination. In order to survive a motion for summary judgment, plaintiff must establish a genuine issue of material fact as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.

*Valentine*, 50 F.Supp.2d at 281-82 (Citations and internal quotations omitted).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and

---

[8]It is clear that "the burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minimis*." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (emphasis in original, citation and internal quotation marks omitted).

depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(citations and internal quotations omitted). However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829.

ANALYSIS

Applying the foregoing principles of law to the facts of this case, the Court finds, at the outset, that Plaintiff's cross-motion under Rule 56(f) should be denied. The Court is mindful that, as discussed above, a Rule 56(f) application should ordinarily be granted where the plaintiff has conducted no discovery. *See, e.g., Czerw v. Ronald Billitier Elec., Inc.*, 03-CV-6613 (CJS) & 03-CV-6614 CJS, 2005 WL 1159425 at *8 (W.D.N.Y. May 17, 2005) (Siragusa, J.) ("[A] grant of summary judgment before any discovery has been conducted would be inappropriate, since plaintiff has not had a fair opportunity to show that defendants' articulated reasons are pretextual."). However, the instant case is unusual in that Plaintiff already had a full opportunity to conduct discovery in the prior proceeding between these parties involving essentially the same claims. *Sty-Lite Co. v. Eminent Sportswear Inc.*, No. 01 Civ. 3320 (CBM), 2002 WL 15650 at *5 (S.D.N.Y. Jan. 7, 2002) ("[A]lthough it is technically true that no discovery has taken place in the *present* incarnation of this case, [plaintiff] had ample opportunity to conduct full discovery in the identical ***prior* action**.") (emphasis in original). In fact, the parties were conducting discovery in case number 04-CV-6239 as late as August 2003, and Plaintiff was deposed by defendant on August 14, 2003, the day before Plaintiff resigned his

position. Accordingly, the Court does not view this case as one in which Plaintiff has had no opportunity to conduct discovery, but on the contrary, views it as a case where Plaintiff has already had a full opportunity to do so.

Nor does the Court believe that the additional discovery which Plaintiff seeks would be helpful. Most notably, the discovery that Plaintiff wants to obtain largely pertains to the timeliness of his constructive discharge claim, and to the administrative exhaustion of that claim. However, that discovery is unnecessary, since as discussed above, Defendant concedes, for purposes of this motion, that the claim is both timely and administratively exhausted. As for the "discovery" that Plaintiff wants to obtain from his own doctors, the Court sees no reason why Plaintiff could not have obtained such evidence already, since, in addition to being available to him directly through the doctors, the information that he references is also part of the administrative record in his social security disability case. In any event, that information, purportedly detailing Plaintiff's subjective reactions to the alleged harassment, would be irrelevant, since the standard to be applied in a constructive discharge case is an objective one.

For all of these reasons, Plaintiff's cross-motion under Rule 56(f) is denied. Plaintiff's alternative request for additional time to respond to the summary judgment motion, in the event that the Court rejected his Rule 56(f) application, is also denied. *See, Players, Inc. v. City of New York*, 371 F.Supp.2d 522, 534 (S.D.N.Y. 2005) (discussing reasons why a plaintiff whose Rule 56(f) application fails is not necessarily entitled to an additional opportunity to oppose the summary judgment motion). Plaintiff made a tactical decision to proceed in the manner that he did in this case, and the Court declines to extend the briefing schedule. *See, Id.*

Next, turning to the merits of Defendant's summary judgment motion, the Court finds that Defendant is entitled to summary judgment on Plaintiff's retaliation claims. The Court previously granted summary judgment to Defendant on all of the very same claims of retaliation alleged here except for two, the FMLA incident and the alleged threats by Lewis. Moreover, as to the FMLA claim, Plaintiff had an opportunity to include that claim in the previous action, but chose not to do so. Specifically, Plaintiff was obviously aware of the FMLA incident at the time he amended his complaint in case number 02-CV-6239 on April 8, 2003. Consequently, that claim, as well as all of the claims of retaliation that the Court specifically addressed in the prior action are barred by res judicata. *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 284 -285 (2d Cir. 2000) ("The doctrine of res judicata, or claim preclusion, holds that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.").

Such preclusion of those retaliation claims that were, or could have been, raised in the earlier actions is not affected by the Supreme Court's decision in *Burlington Northern. See, Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 2428 (1981) ("A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. Nor are the res judicata consequences of a final, unappealed judgment on the merits altered by the fact that the judgment may have been wrong or rested on a legal principle

subsequently overruled in another case.") (citations omitted).[9]

Even assuming, however, that the FMLA claim was not barred by res judicata, Defendant would still be entitled to summary judgment. Plaintiff has not established a prima facie case of retaliation concerning the FMLA incident for at least two reasons: First, Plaintiff suffered no materially adverse retaliation, but rather, he claims only that he was required to submit what he viewed as "excessive documentation" in support of his FMLA claim; and second, Plaintiff has come forward with no evidence to refute the affidavit of the FMLA claim administrator, who states that he was unaware of Plaintiff's protected activity when he requested such documentation.

Similarly, Plaintiff has failed to demonstrate a prima facie case of retaliation concerning the alleged threats by Lewis. Specifically, even accepting that Lewis told Plaintiff to "be a man," that she told him he was "seeing dollar signs," and that she said that "if anyone was fired, he would be the first to go," these incidents were not materially adverse to Plaintiff, either separately or together. *See, e.g., Pugni v. Reader's Digest Ass'n, Inc.*, No. 05 Civ. 8026(CM), 2007 WL 1087183 at *23 (S.D.N.Y. Apr. 9, 2007) (Supervisor's threat that plaintiff's days at the company "were numbered" "did not constitute a materially adverse action. The alleged threat, assuming it happened, was never carried out."). On that point, although Plaintiff characterizes Lewis's comment

_____

[9]Plaintiff cites *Montana v. United States*, 440 U.S. 147, 153-155, 99 S.Ct. 970, 973 (1979) for the proposition that collateral estoppel may not apply where "legal principles have changed significantly" since the prior judgment. (Plaintiff's Memo of Law [#32] at 11). In that regard, Plaintiff maintains that collateral estoppel should not apply, since the *Burlington Northern* decision significantly changed the legal principles involved in Title VII retaliation claims. However, the *Montana* case is inapplicable here, since it concerns collateral estoppel-issue preclusion, while the Court's decision concerns the separate doctrine of res judicata-claim preclusion. In any event, Plaintiff's argument, if correct, would only affect the FMLA excessive documentation claim, since Plaintiff maintains that he is not seeking to relitigate any claims actually raised in his earlier lawsuits. (Plaintiff's Memo of Law [#32] at 14).

about being "the first to go" as a threat, the statement was a factual observation concerning Plaintiff's status as the least-senior PS-5 clerk. Moreover, even assuming *arguendo* that Lewis's comment that Plaintiff "would be the first to go" met the low threshold for a prima facie showing, Defendant came forward with a legitimate non-discriminatory reason for the comment. Specifically, the Postal Service was considering eliminating the position, and Plaintiff was the PS-5 clerk with the least seniority. Moreover, Defendant has presented evidence that the proposed elimination of Plaintiff's position, and the creation of a new PS-6 position, even though it never occurred, was warranted for legitimate business reasons. Namely, the PS-5 clerks had too little work to do, and the PS-6 clerk had too much. Plaintiff has not come forward with any evidentiary proof in admissible form to the contrary. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

The Court will now consider Plaintiff's constructive discharge claim. The Court finds that where, as here, a plaintiff is claiming that he was constructively discharged based upon acts of retaliation,[10] the acts complained of must actually constitute retaliation under Title VII. In *Suders*, the Supreme Court dealt with "one subset of Title VII constructive discharge claims: constructive discharge resulting from sexual harassment, or "hostile work environment." *Pennsylvania State Police v. Suders*, 124 S.Ct. at 2352. The Supreme Court further noted that, "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge

---

[10]*See*, Amended Complaint [#2] ¶ 4 (Plaintiff alleged that he was "subject to an ongoing pattern of retaliation between March 2002 through February 14, 2003 which then culminated in his constructive discharge on August 14, 2003."). Plaintiff has never asserted in his lawsuits before this Court that he was subjected to a hostile work environment.

case." *Id*. at 2356. Presumably then, when dealing with a claim for constructive

discharge resulting from retaliation, actual retaliation is a necessary predicate. *See*,

*Downey v. Isaac*, 622 F.Supp. 1125, 1133 (D.D.C. 1985) ("In sum, in a retaliatory

constructive discharge case, *a plaintiff must show that he/she was retaliated against*

because of his/her E.E.O. activity and that retaliation constituted intolerable working

conditions in which a reasonable person in similar circumstances would have felt

compelled to resign.") (emphasis added), *aff'd without opinion* 794 F.2d 753 (D.C. Cir.

1986); *Delashmutt v. Wis-Pak Plastics, Inc.*, 990 F.Supp. 689, 697 (N.D. Iowa 1998)

(Stating, regarding "constructive discharge as the result of retaliatory conduct," that "if [a

plaintiff] cannot prove retaliation, because she cannot prove any adverse employment

action, then she *necessarily* cannot prove her employer made her working environment

so intolerable as to establish any independent constructive discharge claim.") (emphasis

added); *Amato v. Package Machinery Co.*, Civ. A. No. 81-0380 F, 1987 WL 7238 at *13

(D. Mass. Mar. 2, 1987) ("In analyzing a claim of retaliatory constructive discharge,

plaintiff must show she was indeed retaliated against for asserting her rights under Title

VII and that retaliation constituted intolerable work conditions leading to the alleged

constructive discharge. Because the Court concludes plaintiff has failed to carry her

burden of persuasion on the retaliation element, her constructive discharge claim must

be denied.") (citation omitted). Consequently, since the Court has already determined,

both in the prior case and in the instant case, that the complained-of actions fail to

establish actionable retaliation, Plaintiff's constructive discharge claim based on

retaliation must also fail. Moreover, even if a reviewing court were to disagree that the

dismissal of Plaintiff's retaliation claims *necessarily* requires the dismissal of his

retaliatory constructive discharge claim, this Court alternatively finds that the acts alleged by Plaintiff fail to establish a constructive discharge as a matter of law.[11] *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985).

## CONCLUSION

Upon further consideration of this case in light of *Burlington N. & Santa Fe Ry. Co. v. White*, Plaintiff's applications (Docket Nos. [#9][#32]) are denied, Defendant's motion (Docket No. [#3]) for summary judgment is granted, and this action is dismissed.

SO ORDERED.

Dated: Rochester, New York
     July 21, 2009

ENTER:


*/s/ Charles J. Siragusa*
CHARLES J. SIRAGUSA
United States District Judge

---

[11]For example, as discussed above at page 13, it appears from the timing of Plaintiff's purported constructive discharge that the "last straw" that actually caused him to resign was not any of the alleged retaliation set forth above, but instead, was his belief that Defendant had failed to pay his judgment creditors in connection with the settlement of his first lawsuit against Defendant. That allegation is not part of this case, and it is the Court's understanding that Plaintiff's belief in that regard was later shown to be mistaken.